## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| AMRITPAL SINGH NAGI, | ) |
| 25 Peperell Court | ) |
| Bethesda, Maryland  20817 | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    Case No. |
| | ) |
| ANTHONY R. FOXX, Secretary, | ) |
| U.S. Department of Transportation, | ) |
| 1200 New Jersey Ave, SE | ) |
| Washington, D.C. 20590 | ) |
| | ) |
|     Defendant. | ) |
_____)

## COMPLAINT FOR DISCRIMINATION

COMES NOW Plaintiff Amritpal S. Nagi, by and through undersigned counsel, and states as follows:

1.    Plaintiff brings this action pursuant to Title VII of the United States Civil Rights Act for discrimination in employment and retaliation on the basis of race, skin color, religion, gender, national origin, age and protected activity.

## JURISDICTION AND VENUE

2.    Jurisdiction of this court is founded pursuant to 28 U.S.C. §§ 1331 and 1343.

3.    Venue lies in this Court, pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) and (c) since the employment practices alleged to be unlawful were committed by defendant and its agents within the District of Columbia and it is a claim against an agency of the United States through its Secretary.

## PARTIES

4.    Plaintiff, Amritpal Singh Nagi, is an American citizen. He is of South Asian

descent, specifically from the Punjab region of north India. Complainant is referred to as "Paul Nagi" to his professional colleagues.

5.      Anthony R. Foxx is the Secretary of the United States Department of Transportation, a duly-authorized and organized department of the United States of America  with  its headquarters located in Washington, D.C.  The Department of Transportation is subject to the prohibitions against discrimination and retaliation pursuant to Title VII of the United States Code.

6.       The Federal Aviation Agency (the "Agency" or "FAA") is a federal agency of the U.S. Department of Transportation.

## FACTS COMMON TO ALL COUNTS

7.      Mr. Nagi is a practicing Sikh and maintains long un-shorn hair that is covered by a turban on his head,  as well as a long, neat beard.

8.      On his applications for employment, Complainant reported that he spoke Punjabi, Hindu and Urdu, in addition to English.

9.      Complainant possesses a Bachelor's of Science Degree in Electronics Engineering from George Washington University. Complainant received a Masters Degree in Telecommunications and Computers from the same university.

10.     Complainant maintains several professional Engineering certifications.

11.     Since 1984, Complainant has worked consistently in the field of electronics and systems engineering. In 1987 Complainant joined Volpe-DOT, working for the FAA Telecommunications Network Engineering and Management Division, and in 1991, Complainant transferred to the Federal Aviation Administration, within the same work area

12.     Starting in 2003, Complainant was placed on the FTI Engineering Team.

13.   By June 2012, was a project engineer under the Enterprise Engineering lead with responsibilities for AeroMACS, NVS, FTI FTSD, NAS-RD-2011 and NCP.  In October 2012, his duties were reassigned to  FTI Mission Support Engineering, FTI FTSD, NCP and CINP Technical Reviews.

14.   From 2000 to 2016, Complainant had applied and been denied more than fifteen efforts for promotion to supervisory positions. K-Band promotions within CINP which led to the promotions for Maureen Cedro, Keith Wallace, Curtis Porter, Bill Syptack, Carl Stokes, Jerry Groce, Emily Campbell, Luci Holemans, John Zse, Suzanne Styke,  Jim Tertocha, Anne Suissa, Charles Burand, Mike Sullivan, Patton Turner, Joseph Lahoud, Ammyanna Williams and Jeff McCoy.

15.   In 2000, Complainant complained about derogatory comments about "Arabs" made by two former supervisors.

16.   In about 2005, Complainant came under the direct supervision of Maureen Cedro. Ms. Cedro is white and a practicing Catholic.

17.   Mrs. Cedro does not possess a college degree or any equivalent professional certifications in engineering.

18.   In about 2001 and 2007, Complainant submitted an affidavit in support of a civil rights action brought by another Asian Indian Program Manager at the FAA, Sampath Krishnan, citing the same FAA managers for illegal discrimination against Asian Indians. Ms. Cedro knew of that activity since Mr. Krishnan had complained, in part, discriminatory non-selection for a position Ms. Cedro was selected.

19.   In about 2012, Ms. Cedro was promoted to Complainant's second-line supervisor, and Cedro placed Jim Tertocha, a white male, in her position.

20.     After a month or two,  Ms. Cedro replaced Tertocha with Luci Holemans, a white woman and a practicing Catholic.

21.     Luci Holemans had a BS in electrical engineering and MS in engineering management with certifications in information security and program management. Ms. Holemans does not hold any professional engineering certifications or post graduate studies in telecommunications/communications or computer engineering studies.

22.     For nearly her entire FAA career, Ms. Holemans insisted that her duty location remain at the Tech Center in New Jersey, although both of her predecessors as FTI Engineering Manager, and nearly all of her subordinates, were based at FAA headquarters in Washington.

23.     As a result, Ms. Cedro agreed to allow Ms. Holemans to assign Teresa Matos, a Hispanic woman and Catholic, as the D.C.-based Team Lead for the four project engineers under Holemans' direct supervision.

24.     Teresa Matos, after having completed a BS in electrical engineering degree, completed an Associate Degree in Applied Science.  Since 1991, Ms. Matos has moved from job to job within the FAA performing non-specialized engineering work. According to Ms. Matos's resume, she learned her advanced telecommunications engineering or computer science background from having worked as Team Lead from 2012-2014 as "On the Job Training."

25.     As team lead, Ms. Matos did not have supervisory duties over her project engineers.

26.     Holemans was familiar with Ms. Matos' and Ms. Cedro's religious practices. Ms. Holemans and Ms. Matos would engage in bible discussions together and Ms. Holemans would see Ms. Cedro at noon mass at a Catholic church near FAA headquarters.

27.     From the beginning of Ms. Holemans' tenure as FTI Engineering Manager, Complainant sought to assist with her transition and provide her with all necessary information relating to the technical work of the office. Complainant provided Ms. Holemans a copy of his formal duties assigned in his FY 2012 Performance Plan, as well as status of all his on-going work.

28.     When Ms. Holemans implemented the team lead structure, Complainant made a "general comment" questioning the need of a Team Lead "at the project engineering level." Complainant did not otherwise "protest" the Team Lead structure generally or Ms. Matos's involvement  in particular. Indeed, Complainant's colleague, Roberto Estrella, voiced similar concerns.

29.     Through the summer and fall of 2012, Complainant cooperated with Ms. Holemans and Ms. Matos in educating them on the technical work of the division and accepted changes, without protest, to his duties as requested by Ms. Holemans. Complainant never refused or told Ms. Holemans he could not perform duties requested of him.

30.     Rather, Complainant found himself presented with work duties inconsistent with the performance plan established for that year and what he deemed to be dismissive treatment by Ms. Matos.

31.     On December 17, 2012, Complainant told Ms. Matos that changes in his assigned duties against his performance plan must be approved by Ms. Holemans. During the meeting, Ms. Matos yelled at Complainant and raised her hand as if she was going to strike him.

32.     Complainant reported this behavior to Ms. Cedro and later Ms. Holemans on January 3, 3012.

33.     Six days later, on January 9, 2013, Ms. Holemans directed that Complainant meet with Ms. Matos twice daily. Ms. Holemans' had not previously raised any performance issues with Complainant that would explain this action, but told him that it would be a "workload exercise."

34.     Complainant expressed concern about the added meeting schedule but never told Ms. Holemans he would refuse her directive. Ex. 6 at 106. Nevertheless, Ms. Holemans yelled at Complainant telling him "I am your boss and you better follow my directions." In response to Complainant's request to be excused from the meeting, Ms. Holemans told complainant that he is free to "escalate" to anyone he chose.

35.     Upon leaving the meeting, Complainant, accompanied by Mr. Estrella, went to Malcolm Andrews's office, Ms. Cedro's direct supervisor. During that contact, Mr. Estrella reported that no other project engineers were required to engage in these meetings.

36.     The next day, Ms. Holemans issued a written warning directing Complainant to participate in the twice a day meeting with Ms. Matos or face disciplinary action.

37.     Thereafter, Complainant attended twice-daily meeting with Ms. Matos for a daily total of two-three hours and provided her with written reports in the morning and afternoon.

38.     As a result of his complaints to Ms. Cedro and Mr. Andrews, Mr. Andrews told Ms. Cedro to have Ms. Holemans "stand down." Ms. Cedro told Ms. Holemans that the meetings were "unnecessary" and instructed them to cease. Ms. Holemans ignored the directive of her immediate supervisor.

39.     Although Complainant had been initially told the reporting would last two weeks, after about one month, Ms. Holemans told him the meetings would last "indefinitely."

6

40.     Complainant again wrote to Malcolm Andrews. As a result, Ms. Andrews escalated the issue to the Accountability Board. Id. Complainant also filed a complaint with the Department of Transportation Office of Inspector General.

41.     Eventually, Mr. Andrews assigned Michael Bateman to conduct an investigation into Complainant's complaints.

42.     On April 10, 2013, Ms. Holemans held Complainant's mid-year evaluation with Ms. Matos present. After Ms. Holemans highlighted Ms. Matos' "coaching efforts," Complainant noted that Ms. Matos' "feedback" was negligent and had offered no substantive suggestions to any of his oral or written reports.

43.     On May 2, 2013, Complainant again complained to Ms. Cedro about his mid-year evaluation and that FAA procedures had been violated in conducting the performance evaluation.

44.     On September 26, 2013, a vacancy announcement for the 800 series Supervisory General Engineer position was issued, and on October 9, 2013, Complainant applied. Complainant believed he was qualified as an SME in the field for 29 years.

45.     Ms. Matos applied as well. In her application, Ms. Matos claimed to have performed "On the Job Training" to substantiate her professional knowledge of advance telecommunications engineering and computer science disciplines.

46.     On October 30, 2013, Ms. Holemans met with Complainant in a meeting to open his 2014 performance plan. Ms. Matos was present in the meeting. Complainant protested that Ms. Matos presence as violating his privacy rights. When Complainant sought the assistance of a union representative, Ms. Holemans refused to meet with Complainant in the presence of union representation.

47.     Later that afternoon, Ms. Holemans issued Complainant a Letter of Reprimand for "failing to follow instructions."

48.     The day after receiving the Letter of Reprimand, Complainant was approached by a co-worker who uttered "Heil Hitler" to him.

49.     The next day, October 31, 2013, a vacancy announcement for a Program Manager position was issued.

50.     On October 31, 2013, a referral list of eight minimally qualified applicants was issued for Supervisory General Engineering position.

51.     At some unknown point, Ms. Cedro advised the recruiting manager, Kimmarie Grimaldi, that she would proceed with a panel to conduct a "paper review" of the applications for the Supervisory General Engineering position and Grimaldi submitted the names of three proposed panelists to Ms. Cedro. Of her suggested panelists, Ms. Cedro only selected Michael Bateman.

52.     Instead, although she knew Complainant had applied for the position, Ms. Cedro selected Luci Holemans as a panelist for the paper review.

53.     Ms. Cedro claims to have selected Deborah Lawrence, a L-band Senior Manager, and, at the time, a direct report of Malcolm Andrews, as the "third panelist."

54.     Ms. Lawrence denied that she participated in this panel review.

55.     Accordingly, although the Agency has proffered scores from a "third panelist," it provides no credible record evidence as to who assessed the applications and rendered those scores, if anyone.

56.     For her part, Ms. Holemans awarded Complainant a total score of "8.50." That score was twenty points lower than the score Mr. Bateman awarded to Complainant and twenty one and a half points lower than the score she awarded to Ms. Matos.

57.     Ms. Grimaldi noticed the disparity in Ms. Holemans' scoring and flagged her concerns to Ms. Cedro. Ms. Cedro agreed with Ms. Grimaldi's assessment that Ms. Holemans' scores reflected a "lack of objectivity," and Grimaldi suggested that the Holemans scores be discounted. Ms. Grimaldi sensed "frustration" with Holemans' conduct.

58.     On November 20, 2013, Complainant applied for the open Program Manager position and believed he met the technical requirements of the position and had possessed Program Management experience.

59.     On December 5, 2013, referral list for Program Manager was issued, and Complainant was found to be minimally qualified.

60.     For *this* recruitment effort, Ms. Cedro requested that Ms. Grimaldi conduct a paper review before interviews were conducted.

61.     In conducting the paper review, both Ms. Cedro and Ms. Grimaldi knew Complainant had made the referral list.

62.     Ms. Grimaldi also knew by this point the issues that had been percolating between Complainant and his supervisors, including the biased scoring by Ms. Holemans. As a result of Ms. Grimaldi's ranking, Complainant was not interviewed.

63.     On December 20, 2013, Complaint filed a step 1 grievance protesting the Letter of Reprimand. By that and subsequent grievances, Complainant alleged that he was being targeted with totally false allegations of misconduct solely to tarnish his outstanding 26-year work record, and prevent him from applying and being selected for promotion opportunities

within the FAA's telecommunications organization. The FAA management knew that the Complainant was highly educated and experienced and was easily more qualified than just about any other candidate if the selection process was fair and based on merit principles.

64.     Indeed, in just 2013, Complainant had applied for about ten promotions to technical and management positions. Complainant was even interviewed for the position that supervised the Supervisory General Engineer position. No one was hired under that vacancy announcement.

65.     On April 23, 2014, an unknown FAA employee with access to Complainant's area placed a vacancy announcement on his desk. The announcement was for the position of Asian Elephant Keeper at the National Zoo.

66. On July 28, 2016, a Final Order was issued by defendant dismissing Mr. Nagi's administrative complaint of discrimination. Accordingly, Mr. Nagi has exhausted his administrative remedies.

## FIRST CAUSE OF ACTION
### Violation of Title VII - Discrimination

67.     Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "66" as if originally pleaded herein.

68.     Defendant, through its agents or supervisors, unlawfully discriminated and denied Mr. Nagi equal employment opportunities because of his race, skin color, religion, gender, national origin, and age when it denied him equal promotional and other employment opportunities without cause of justification, in violation of Title VII of the Civil Rights Act of 1964, as amended.

69.     As a direct and proximate result of the illegal employment discrimination by Defendant, Mr. Nagi has suffered, and continues to suffer severe pain and suffering and

extreme mental anguish and emotional distress. Mr. Nagi has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a)     To award him, under Title VII of the Civil Rights Act, all the back and front pay and fringe benefits he has lost as a result of defendant's unlawful discrimination against him;

(b)     To award him, under Title VII of the Civil Rights Act, compensatory damages in the amount of $300,000.00;

(c)     To award him reasonable attorney's fees and costs of this action; and

(d)     To award him such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
### Violation of Title VII – Retaliation

70.     Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "69" as if originally pleaded herein.

71.     By the actions set out above, defendant subjected Mr. Nagi to unlawful retaliation and denied him the rights and privileges secured by Title VII, when it denied him equal promotional and other employment opportunities without cause of justification, in violation of Title VII of the Civil Rights Act of 1964, as amended, because he had engaged in protected activity under the United States Civil Rights Act.

72.     As a direct and proximate result of the illegal employment action by defendant, Mr. Nagi has suffered, and continues to suffer, severe pain and suffering and extreme mental anguish and emotional distress.  Mr. Nagi has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a)     To award him, under Title VII of the Civil Rights Act, all the back and front pay

11

and fringe benefits he has lost as a result of defendant's unlawful discrimination against him;

(b)      To award him, under Title VII of the Civil Rights Act, compensatory damages in the amount of $300,000.00;

(c)      To award him reasonable attorney's fees and costs of this action; and

(d)      To award him such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION
### Violation of Title VII – Hostile Work Environment

73.      Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "72" as if originally pleaded herein.

74.      Defendant, through its agents or supervisors, unlawfully discriminated and denied Mr. Nagi equal employment opportunities because of his race, skin color, religion, gender, national origin, and age when it created a hostile and abusive environment that resulted in the denial of promotional and other employment opportunities without cause of justification, in violation of Title VII of the Civil Rights Act of 1964, as amended.

75.      As a direct and proximate result of the illegal employment discrimination by Defendant, Mr. Nagi has suffered, and continues to suffer severe pain and suffering and extreme mental anguish and emotional distress. Mr. Nagi has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a)      To award him, under Title VII of the Civil Rights Act, all the back and front pay and fringe benefits he has lost as a result of defendant's unlawful discrimination against him;

(b)      To award him, under Title VII of the Civil Rights Act, compensatory damages in the amount of $300,000.00;

(c)      To award him reasonable attorney's fees and costs of this action; and

(d)     To award him such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a jury trial on all issues.

Respectfully submitted,

/s/ Lisa Alexis Jones
Lisa Alexis Jones, Esq.
Lisa Alexis Jones, PLLC
1 Rockefeller Plaza
10th Floor
New York, N.Y.  10020
(646) 756-2967
ljones@lisaajones.com

*Counsel for Plaintiff*

Dated: October 26, 16