UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMRITPAL NAGI,<br><br>        *Plaintiff*,<br><br>v.<br><br>PETER P. M. BUTTIGIEG,<br>*Secretary, U.S. Department of Transportation*,<br><br>        *Defendant*. | Civil Action No. 16-2152 (FYP) |

## MEMORANDUM OPINION

Plaintiff Amritpal Nagi is employed as an engineer at the Federal Aviation Administration ("FAA"). Nagi alleges that his employer unlawfully discriminated against him when he was passed over for a promotion, and retaliated against him for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. §§ 2000e, *et seq*. Nagi brings his claims against Defendant Peter P. M. Buttigieg, in his official capacity as the Secretary of the United States Department of Transportation, of which the FAA is a component. Before the Court is Defendant's Motion for Summary Judgment, in which the Secretary argues that the FAA had legitimate, nondiscriminatory, and nonretaliatory reasons for declining to promote Nagi. For the reasons that follow, the Court will grant the Motion for Summary Judgment.

## BACKGROUND

### I.    Factual Background

Plaintiff, who is known as Paul Nagi to his colleagues, is a Sikh-American citizen of Indian origin. *See* ECF No. 50-2 (Defendant's Statement of Material Facts Not in Dispute), ¶ 1; ECF 53-1 (Plaintiff's Responses to Defendant's Statement of Material Facts), ¶ 1. Nagi has been

employed at the FAA since 1991; he works on electronics and systems engineering as a member of the FAA Telecommunications Infrastructure ("FTI") Engineering Team. *See* Def. SMF, ¶ 2; Pl. Resp. SMF, ¶ 2. Between 2005 and 2011, Maureen Cedro was Plaintiff's direct supervisor. *See* Def. SMF, ¶ 3; Pl. Resp. SMF, ¶ 3. After Cedro was promoted, Luci Holemans became Plaintiff's first-level supervisor. *See* Def. SMF, ¶ 4; Pl. Resp. SMF, ¶ 4. Holemans assigned Teresa Matos to lead Plaintiff's team, and Holemans supervised the team members directly. *See* Def. SMF, ¶ 5; Pl. Resp. SMF, ¶ 5.

Nagi alleges that between 2000 and 2016, he unsuccessfully applied for promotions to supervisory positions more than fifteen times. *See* Pl. Resp. SMF, ¶ 98. During that period, Nagi engaged in several instances of alleged protected activity: In 2001 and 2007, he submitted affidavits in support of a civil rights action brought by another Indian Program Manager, who accused FAA managers, including Cedro, of illegal discrimination. *Id.*, ¶ 101. In 2013, he initiated union grievance procedures against Holemans and Matos for fostering a hostile work environment. *See id.*, ¶¶ 161–82; *see also id.*, ¶¶ 109–27 (describing incidents leading up to Plaintiff's formal complaint).

## II. Supervisory Program Manager Position

In November of 2013, Plaintiff applied for a position as a Supervisory Program Manager. *See* Def. SMF, ¶¶ 8, 21; Pl. Resp. SMF, ¶¶ 8, 21. In that position, he would have supervised the Enterprise Programs Team, which is a component of the Communications, Information, and Network Programs ("CINP") Group. *See* Def. SMF, ¶ 8; Pl. Resp. SMF, ¶ 8. The Supervisory Program Manager would report to Cedro, the CINP Group Manager. *See* Def. SMF, ¶ 9; Pl. Resp. SMF, ¶ 9. According to the vacancy announcement, applicants were required to have at least one year of "specialized experience" that "include[d] experience providing oversight,

direction and guidance to management and staff regarding business planning activities." *See* ECF No. 50-7 (Vacancy Announcement) at 2; Def. SMF, ¶ 15; Pl. Resp. SMF, ¶ 15.

One of the primary responsibilities of the Supervisory Program Manager was to serve as the liaison and the lead contract representative for a multi-billion-dollar FAA Telecommunications Infrastructure Contract. *See* Def. SMF, ¶ 12 (citing ECF No. 50-6 (Deposition of Maureen Cedro) at 104:8–12); Pl. Resp. SMF, ¶ 12. The Supervisory Program Manager would also manage the second largest operational budget within the FAA. *See* Def. SMF, ¶ 12; Pl. Resp. SMF, ¶ 12. The ideal candidate would have experience with and understanding of the work of the Enterprise Program, as well as "soft skills." *See* Def. SMF, ¶ 13 (quoting Cedro Dep. at 114:10–17); Pl. Resp. SMF, ¶ 13.

The evaluation criteria for the Supervisory Program Manager position included four "leadership and management dimensions" or "managerial selection factors." *See* Def. SMF, ¶ 16; Pl. Resp. SMF, ¶ 16. The four managerial selection criteria were: 1) Ability to Achieve Results; 2) Ability to Lead People; 3) Skill in Building Relationships; and 4) Ability to Lead Change. *See* Def. SMF, ¶ 16; Pl. Resp. SMF, ¶ 16; Vacancy Announcement at 2. The position also had two technical requirements: 1) broad knowledge of the National Airspace System components and federal business management; and 2) a comprehensive understanding of product and service management activities involving enterprise infrastructure services. *See* Def. SMF, ¶ 18; Pl. Resp. SMF, ¶ 18; Vacancy Announcement at 2.

Plaintiff applied for the Supervisory Program Manager position on November 20, 2013. *See* Def. SMF, ¶ 21; Pl. Resp. SMF, ¶ 21. In response to a question that asked whether he ever had "direct supervisory responsibilities for a subordinate employee of the FAA," Nagi answered that he did not. *See* Def. SMF, ¶ 25 (quoting ECF No. 50-8 (Deposition of Amritpal Nagi) at

122:17–22); Pl. Resp. SMF, ¶ 25.[1]  In his application, Nagi stated that he possessed all four managerial selection factors, and that he had applied the requisite knowledge, skill, or ability in previous positions at the FAA.  See Def. SMF, ¶ 29; Pl. Resp. SMF, ¶ 29.

### III. Selection Process

Cedro was the selecting official for the Supervisory Program Manager position.  See Def. SMF, ¶ 41; Pl. Resp. SMF, ¶ 41.  Kimmarie Grimaldi, a General Engineer/Senior Analyst at the FAA, was the lead coordinator for all recruitment activities within the Enterprise Services organization, including recruitment for the Supervisory Program Manager position.  See Def. SMF, ¶¶ 43–44 (citing ECF No. 50-13 (Affidavit of Kimmarie Grimaldi) at 1–2); Pl. Resp. SMF, ¶¶ 43–44.  According to Grimaldi, she had no prior knowledge of or working relationship with Nagi, and she was unaware of his race, national origin, religion, and alleged prior protected activity.[2]  See Def. SMF, ¶ 53 (citing Grimaldi Aff. at 2; and ECF No. 50-15 (Deposition of Kimmarie Grimaldi) at 80:10–81:2).

The FAA Human Resources Department generated a referral list of the 14 "best qualified" candidates for the position, which included Nagi and Emily Campbell, who was ultimately selected for the position.  See Def. SMF, ¶¶ 49–50; Pl. Resp. SMF, ¶¶ 49–50.  Grimaldi conducted an initial paper review of the applications of the candidates on the referral

---

[1]  In his Opposition, Plaintiff implies that he had FAA supervisory experience.  See Pl. Opp. at 11 ("Defendant fares no better in distinguishing between the relative non-technical qualifications between Mr. Nagi and Campbell, minimizing Mr. Nagi's FAA supervisory experience, for example, while downplaying Campbell's zero FAA supervisory experience[.]").  There is no record evidence, however, that Nagi ever held a supervisory position at the FAA; Plaintiff has admitted that he never held such a position.  See Def. SMF, ¶ 25; ECF No. 55-1 (Defendant's Replies to Plaintiff's Responses and Counter-Statement of Material Facts), ¶¶ 32–33.

[2]  Plaintiff disputes this statement, arguing that Grimaldi should have known of his ethnicity and religion by his name and by references included in his application.  See Pl. Resp. SMF, ¶ 53.  Plaintiff also asserts that Grimaldi knew of his prior disputes with his superiors.  Id.  Plaintiff, however, does not cite to any evidence in the record to support that assertion.  Further, at his deposition, Plaintiff did not dispute the statement that Grimaldi had no knowledge of him or working relationship with him.  See Nagi Dep. at 183:20–25; see also Grimaldi Aff. at 2 (stating that Grimaldi had no knowledge of Plaintiff); Grimaldi Dep., at 80:19–81:2 (stating that Grimaldi had never worked with Plaintiff before).

list. *See* Def. SMF, ¶ 51 (citing Grimaldi Aff. at 2–4; and Grimaldi Dep. at 76:2–22); Pl. Resp. SMF, ¶ 51. Grimaldi used a scale of 1 to 5 (with 1 being the lowest) to rate each candidate on the criteria identified in the Vacancy Announcement. *See* Def. SMF, ¶ 55; Pl. Resp. SMF, ¶ 55. During her review, Grimaldi ranked Campbell number 1 out of the 14 candidates, based on Campbell's total score of 26. *See* Def. SMF, ¶¶ 58–59 (citing Grimaldi Aff. at 4; and ECF No. 50-17 (Paper Review Summary)), Pl. Resp. SMF, ¶¶ 58–59. Campbell received the highest possible score of 5 on two of the selection criteria, and a score of 4 on the other four. *See* Def. SMF, ¶ 59 (citing Paper Review Summary), Pl. Resp. SMF ¶ 59. Grimaldi ranked Plaintiff as number 11 out of the 14 candidates, based on his total score of 7. *See* Def. SMF, ¶¶ 60–61 (citing Grimaldi Aff. at 4; Grimaldi Dep. at 79:14–80:18; and Paper Review Summary); Pl. Resp. SMF, ¶¶ 60–61.[3] Plaintiff received a score of 1 on five out of the six selection criteria. *See* Def. SMF, ¶ 61 (citing Paper Review Summary); Pl. Resp. SMF, ¶ 61.

After Cedro received the scores from the initial review, six candidates were extended invitations to interview. *See* Def. SMF, ¶¶ 64–65 (citing Cedro Dep. at 49:15–50:4, 50:2–4; 131:21–132:2, 143:15–144:18; ECF No. 50-5 (Affidavit of Maureen Cedro) at 3–4; and Paper Review Summary); Pl. Resp. SMF, ¶ 64–65. Although Plaintiff was not among the top six candidates based on Grimaldi's initial review, Cedro nevertheless had discretion to offer to him an interview. *See* Def. SMF, ¶ 64; Pl. Resp. SMF, ¶ 64. Plaintiff was not extended an interview. *See* Def. SMF, ¶¶ 71–72 (citing Cedro Dep. at 146:2–15); Pl. Resp. SMF, ¶¶ 71–72. After the

---

[3] Plaintiff disputes these facts, on the ground that Defendant has failed to produce the notes that were contemporaneously taken by Grimaldi when she made her initial assessments. Pl. Resp. SMF, ¶¶ 60–61. Although those notes are not in the record, and were unable to be located, *see* Def. Reply to Pl. SMF, ¶ 172, Grimaldi's affidavit describes her initial review and scoring system, *see generally* Grimaldi Aff., and her Paper Review Summary includes the scores and ranks assigned to each applicant, *see* Paper Review Summary at 152.

six candidates were interviewed, Cedro selected Emily Campbell for the position on March 27 or 28 of 2014.  *See* Def. SMF, ¶ 82 (citing Cedro Aff. at 4–5), Pl. Resp. SMF, ¶ 82.

## IV.     Procedural History

Nagi filed his original complaint on October 26, 2016, alleging discrimination, retaliation, and a hostile work environment under Title VII.  *See generally* ECF No. 1 (Complaint).  The original complaint challenged Nagi's non-selection for two positions: (1) a Supervisory General Engineer position, and (2) the Supervisory Program Manager position.  *See id.*  Nagi later realized, however, that he could not bring suit based on his non-selection for the Supervisory General Engineer position because the facts underlying that hiring process are the subject of a union grievance.[4]  Nagi therefore filed a Second Amended Complaint on May 3, 2019, which alleged discrimination and retaliation only in connection with his non-selection for the Supervisory Program Manager Position.  *See generally* ECF No. 33 (Second Amended Complaint).  Accordingly, any allegations related to Nagi's non-selection for the Supervisory General Engineer position are now relevant only as "background" information, *see* ECF No. 55 (Defendant's Reply); the remaining legal claims concern only Nagi's non-selection for the Supervisory Program Manager position.  In the Second Amended Complaint, Plaintiff requests back pay, front pay, and fringe benefits that he allegedly lost due to Defendant's unlawful discrimination and retaliation, as well as compensatory damages of $300,000.  *See* Sec. Am.

---

[4]     A complainant can either utilize the negotiated grievance procedure or pursue an EEO action, but he cannot do both.  *See Smith v. Jackson*, 539 F. Supp. 2d 116, 130 (D.D.C. 2008) ("An employee who files a timely written grievance irrevocably chooses the negotiated grievance procedure route, and is precluded from filing an EEO complaint on the same matter." (cleaned up)).  Therefore, as Plaintiff acknowledges, he is precluded from asserting claims of discrimination and retaliation arising out of the same facts alleged in a grievance.  *See* ECF No. 11 (Plaintiff's Opposition to Defendant's Motion to Dismiss), at 12–13.  Here, Plaintiff initiated a union grievance process alleging that Luci Holemans and Teresa Matos harassed him and created a hostile work environment.  *See* Pl. Resp. SMF, ¶ 186.  In his Opposition and Counter-Statement of Material Facts, Plaintiff nevertheless references the subject matter of the union grievance.  *See* Pl. Opp. at 11–12 (referencing Holemans' alleged harassment as evidence of pretext for unlawful discrimination and retaliation); Pl. Resp. SMF, ¶¶ 109–22 (describing the alleged harassment from Holemans).

Compl., ¶¶ 56, 59.  On June 11, 2021, Defendant filed a Motion for Summary Judgment, which is now ripe for review.  *See generally* ECF No. 50 (Defendant's Motion).

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*; *accord Etokie v. Duncan*, 202 F. Supp. 3d 139, 145 (D.D.C. 2016).  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241–42 (D.C. Cir. 1987).

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record — including deposition testimony, documentary evidence, affidavits, declarations, or other competent evidence — in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transportation*, 564 F.3d 462, 465 (D.C. Cir. 2009) (citations omitted).  Moreover, where "a party fails to properly support

an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." *See* Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

In recognition of the difficulty of uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc) (citation omitted) (discussing context of employment discrimination claims); *accord Mason v. Geithner*, 811 F. Supp. 2d 128, 174–75 (D.D.C. 2011). But the court's "special caution" does not relieve the plaintiff of his burden to support his allegations with competent evidence. *See Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009) (citation omitted). As in

any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage he bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device — namely, "to weed out those cases insufficiently meritorious to warrant . . . trial" — simply by offering conclusory allegations, speculation, and mere arguments. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II. Title VII Legal Framework

Title VII makes it unlawful for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also id.* § 2000e-16 (barring such discrimination in executive agencies). It also forbids retaliation against employees who engage in protected activity. *Id.* § 2000e-3(a). When there is only indirect evidence of intentional discrimination, the plaintiff may rely on the *McDonnell Douglas* three-step method of proof. *See Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (citations omitted). The first step of the *McDonnell Douglas* framework requires that the employee establish a *prima facie* case of discrimination. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). To establish a *prima facie* case, the employee must show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (citing *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)). In the second step of the analysis, after the employee makes out a *prima facie* case, the "burden . . . shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."

9

*Wheeler*, 812 F.3d at 1114.  If the employer does so, the burden shifts back to the employee in the third part of the test, which requires the employee to "prove that, despite the proffered reason, [he] has been the victim of intentional discrimination."  *Figueroa*, 923 F.3d at 1086 (citing *id.* at 1114).

On summary judgment, however, courts employ a truncated version of the *McDonnell Douglas* framework.  Where "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the D.C. Circuit has instructed that district courts "need not — *and should not* — decide whether the plaintiff actually made out a *prima facie* case."  *Brady v. Off. of Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original); *accord Jeffries v. Barr*, 965 F.3d 843, 860 (D.C. Cir. 2020).  Instead, once the employer proffers a legitimate, nondiscriminatory reason for the adverse employment action, "the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?"  *Brady*, 520 F.3d at 494 (citations omitted); *accord Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008); *see also Figueroa*, 923 F.3d at 1087 (noting that the "*Brady* shortcut" does not "relieve the employer of its burden to articulate a legitimate, nondiscriminatory reason for its action" (cleaned up)); *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016) (stating that "once the employer has claimed a nondiscriminatory reason for its actions, [the] burden-shifting framework disappears" and courts "no longer consider whether the plaintiff properly made out [a] *prima facie* case").  If a plaintiff fails to produce such evidence of pretext, then summary judgment in favor of the employer is proper.  *See Brady*, 520 F.3d at 496–97.

## ANALYSIS

Defendant argues that he is entitled to summary judgment because 1) there is no genuine dispute of material fact regarding the FAA's legitimate, nondiscriminatory and nonretaliatory reasons for Nagi's non-selection, and 2) Plaintiff fails to adduce any evidence that the proffered legitimate reason is a pretext for discrimination. *See* Def. Mot. at 1. In response, Plaintiff argues that the reasons proffered by Defendant for his non-selection are pretextual, and that his non-selection was the product of bias, discrimination, and retaliatory motive for engaging in protected activity. *See generally* ECF No. 53 (Plaintiff's Opposition).

### I. Defendant Proffers Legitimate, Nondiscriminatory, and Nonretaliatory Reasons for Plaintiff's Non-Selection.

Defendant has articulated legitimate reasons for not selecting Plaintiff for the Supervisory Program Manager position: Namely, that other candidates possessed stronger qualifications, and Plaintiff lacked the necessary supervisory experience. *See* Def. Mot. at 6–8. In evaluating Defendant's "legitimate, nondiscriminatory reasons," four factors are "paramount." *Figueroa*, 923 F.3d at 1087. First, the employer must produce evidence that is admissible at trial. *Id.* (citing *Segar v. Smith*, 738 F.2d 1249, 1268 (D.C. Cir. 1984)). Second, the factfinder must "reasonably be able to find that 'the employer's action was motivated by' a nondiscriminatory reason." *Id.* (quoting *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004)). Third, the nondiscriminatory explanation must be "facially credible in light of the proffered evidence." *Id.* at 1088 (cleaned up). And fourth, the evidence must provide a "clear and reasonably specific explanation." *Id.* (quoting *Segar v. Smith*, 738 F.2d 1249, 1269 n.13 (D.C. Cir. 1984)). The employer's burden to articulate a legitimate, nondiscriminatory reason for its decision is the "minimal burden of production." *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006).

Here, Defendant readily meets the test. Admissible evidence establishes that Plaintiff was less qualified for the Supervisory Program Manager Position than the person who was selected, Emily Campbell. In the selection process, Grimaldi conducted an initial review of the applicants' written materials and created a scoring system based on the six hiring criteria (four managerial and two technical). *See* Cedro Aff. at 3–4; Grimaldi Aff. at 2–4. Grimaldi ranked Plaintiff 11 out of the 14 candidates rated and assigned him the lowest possible score on five out of the six criteria. *See* Grimaldi Aff. at 4; Paper Review Summary at 152. By contrast, the successful candidate, Emily Campbell, received the highest score out of the 14 applicants. *See* Grimaldi Aff. at 4; Paper Review Summary at 152.

When Emily Campbell applied for the Supervisory Program Manager position, she had held the position of Program Analyst/Management within the Enterprise Program for the preceding 12 years. *See* ECF No. 50-12 (Application of Emily Campbell) at 13. Although that position was not supervisory, Campbell had two years of supervisory experience prior to joining the FAA. *See id.*; Cedro Dep. at 166:13–167:5. In her position as Program Analyst, Campbell reported to the incumbent Supervisory Program Manager. *See* Cedro Dep. at 34:4–22. As Program Analyst, Campbell served as the lead for the majority of the group's support contracts and served as the Contracting Officer Representative for the "FAA's single largest multi-billion dollar telecommunications contract: FAA's Infrastructure Telecommunications (FTI) contract." *See* Campbell Application at 12.[5] Campbell was also the team lead for the Enterprise Communications Support Services contract team. *Id.* at 6.

---

[5]   Importantly, managing that contract was one of the main responsibilities of the Supervisory Program Manager. *See* ECF No. 50-9 (Position Description) at 2 (stating that duties of the Supervisory Program Manager include "manag[ing] a team of federal and contract personnel to provide enterprise infrastructure services," including "the FAA Telecommunications Infrastructure (FTI) . . . and other FAA owned and leased telecommunications and information management assets").

By contrast, when Plaintiff applied for the Supervisory Program Manager position, he was an electronics engineer, and was working in a different program, under the Enterprise Engineering Team Lead. *See* ECF No. 50-10 (Application of Amritpal Nagi) at 17. In that position, Nagi did not report to the Supervisory Program Manager. *See* Nagi Dep. at 142:9–20. Moreover, Plaintiff stated in his application that he had no supervisory experience at the FAA, *see id.* at 122:17–22, and that he had never held a non-supervisory "team lead" position within the electronics engineering department, *see id.* at 157:7–24; *see also id.* 128:2–129:5 (clarifying that he had no prior experience as a manager or supervisor).

After Cedro reviewed the results of Grimaldi's initial evaluation of the paper applications, she agreed with Grimaldi's assessment of Plaintiff's qualifications; therefore, she declined to exercise her discretion to offer Plaintiff an interview. *See* Cedro Aff. at 4–6; Cedro Dep. at 146:12–15 ("I did not request Mr. Nagi to be part of the interview because . . . the candidates that were selected in my opinion had more of the qualifications for the position that was open."); *see also id.* at 156:12–14 (stating that Plaintiff was mostly an "average worker"). While Plaintiff had a technical background, the position was more focused on financial management and business, areas in which Plaintiff lacked experience; *id.* at 123:21–22 (stating that the position is primarily "business and financial management"); Nagi Dep. at 122:17–22 (stating that Plaintiff had never held a supervisory position at the FAA); *id.* at 128:2–129:7 (clarifying that Plaintiff had no experience as a manager or supervisor of a subordinate employee).

Thus, the evidence in the record supports Defendant's assertion of legitimate, nondiscriminatory reasons for Nagi's non-selection: Based on experience and qualifications, Campbell was a stronger candidate on the merits. *See Holcomb v. Powell*, 433 F.3d 889, 896

(D.C. Cir. 2006) (concluding that the employer's decision to hire the "best applicant" for a position was a legitimate reason). Although Plaintiff argues that his low scores on the initial paper review are "facially incredible" and can "only be explained by the presence of discriminatory and retaliatory bias," Pl. Opp. at 8–9, he proffers no actual evidence of discrimination or retaliation. There is no evidence that Grimaldi, who did the initial screening and ranked Plaintiff eleventh, was aware of Plaintiff's alleged protected activities and knew of Plaintiff's protected characteristics. *See* Grimaldi Aff. at 1–2 (stating that she had no knowledge or working relationship with Plaintiff); Grimaldi Dep. at 81:1–2 (stating that she "had never worked together" with Plaintiff); Nagi Dep. at 183:20–25 (not disputing the statement that Grimaldi "had no knowledge or working relationship with" Plaintiff). Moreover, Cedro testified that she agreed with Grimaldi's assessment and did not offer Plaintiff an interview because he was not well qualified. *See* Cedro Aff. at 6; Cedro Dep. at 146:12–15. Plaintiff points to no evidence that rebuts that testimony.

Defendant's proffered evidence meets the four factors provided in *Figueroa*. *See* 923 F.3d at 1087–88. First, the evidence of the initial review is admissible through the testimony of Cedro, Grimaldi, and the Paper Review Summary sheet.[6] Second, the evidence produced would

---

[6] Plaintiff takes issue with the fact that Defendant produced only a summary table of the paper review scores, rather than Grimaldi's contemporaneous notes and assessments. *See* Pl. Opp. at 8–9. He contends that Grimaldi had no recollection of the basis for her scores, and the record is therefore bereft of evidence of *how* Grimaldi applied the scoring system to his application. *Id.*

The record does reflect that Grimaldi was initially confused when she was shown her scores during her deposition: She was unclear about whether she was looking at her own scores, or scores from the interview panel. *See* ECF No. 53-7 (Deposition of Kimmarie Grimaldi) at 57:21–58:7; *see also id.* at 64:4–6 ("I would not have used a scoresheet this structured. I would have gone through each applicant and rated it right on their application."). But Grimaldi later clarified multiple times that the scores from her review were accurately reflected, *id.* at 76:2–77:16, and that she assigned Plaintiff a score of 7 based on her review of his application and her consideration of the vacancy criteria, *id.* 79:14–80:18.

Plaintiff also asserts that the summary sheet would be inadmissible at trial under the best evidence rule, and that the failure to preserve or produce Grimaldi's contemporaneous notes would be subject to an adverse inference instruction. *See* Pl. Opp. at 9. Those arguments are not supported by any analysis or legal authority. Nevertheless, the best evidence rule is not implicated because the summary sheet is not being offered to prove the contents of Grimaldi's notes; rather, the summary sheet would be offered as evidence of the scores that Grimaldi submitted to

14

allow a jury to find that the non-selection of Plaintiff was motivated by nondiscriminatory and nonretaliatory motives. *See Albert v. Perdue*, No. 17-cv-1572, 2019 WL 4575526, at *4 (D.D.C. Sept. 20, 2019) (stating that a factfinder could find that the non-selection of the plaintiff was nondiscriminatory because the plaintiff was "not among the highest-scoring candidates eligible for the . . . position"). Third, Defendant's proffered explanation for non-selection is "facially credible" in light of the evidence of Plaintiff's qualifications and scores. *See Moss v. Hayden*, No. 18-cv-470, 2020 WL 4001467, at *4 (D.D.C. July 15, 2020) (finding that the employer's justification was "facially credible" because the "selection committee offered the position to the highest-scoring interviewee," and "[p]laintiff, by contrast, received one of the lowest interview scores"); *accord Albert*, 2019 WL 4575526, at *4. And lastly, Defendant's explanation is clear and reasonable, and is explained at length in the record evidence. *See Albert*, 2019 WL 4575526, at *4 (determining that defendant's explanation was "clear and reasonably specific" when the defendant set up an "interview system with precise rating criteria" that showed "precise breakdown between the candidates," and the plaintiff scored lower than the successful candidates in every category (cleaned up)). Therefore, there is no genuine issue dispute that Defendant has established a nondiscriminatory reason for Plaintiff's non-selection.

## II.  Plaintiff Fails to Adduce Evidence of Pretext.

Where, as here, "an employer asserts a legitimate, non-discriminatory reason for an adverse employment action," the singular "central inquiry" is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the

---

Cedro. Moreover, an adverse inference appears unwarranted because there is no indication that the Paper Review Summary is not an accurate reflection of Grimaldi's assessment, and thus no reason to believe that the notes (if they existed) would support Plaintiff's claims.

15

plaintiff on a prohibited basis." *Adeyemi,* 525 F.3d at 1226. "Evidence of pretext may include variant treatment of similarly situated employees, discriminatory statements by decision makers, and irregularities in the stated reasons for the adverse employment decision." *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010) (citing *Brady*, 520 F.3d at 495 n.3). Plaintiff, however, fails to muster any evidence that Defendant's proffered reason for Plaintiff's non-selection was a pretext for discrimination or retaliation.

As an initial matter, Plaintiff fails to show discriminatory or retaliatory motive by demonstrating that the "factfinder [could] conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d at 1294. Plaintiff argues that he was more qualified than Campbell on the technical elements in the hiring criteria, due to his engineering background, and that his overall low ranking is therefore evidence of pretext for discrimination and retaliation. *See* Pl. Opp. at 10, 13, 15. That argument is unconvincing, however, because the technical elements were only two out of the six elements. *See* Vacancy Announcement at 2. Moreover, the hiring manager explained that the work of the Supervisory Program Manager position was more focused on financial management and business, and that the technical requirements were less important. *See* Cedro Dep. at 114:10–17, 123:10–19, 124:11–125:3. Significantly, Plaintiff had no supervisory experience whatsoever. *See* Def. SMF, ¶ 25; Pl. Resp. SMF, ¶ 25. Because the managerial focus of the Supervisory Program Manager position is undisputed, no reasonable employer could have found Plaintiff "significantly better qualified" for the job than Campbell. *See Moss*, 2020 WL 4001467, at *5 (finding that the plaintiff failed to show pretext when she argued that she was more qualified in one of the job qualifications, because the three other qualifications were more critical to the position).

Plaintiff also argues that the scores that he received from Grimaldi on the technical elements were so unjustifiably low that they constitute proof of discrimination. *See* Pl. Opp. at 12–13 ("No reasonable trier of fact could conclude that Grimaldi's scoring of these candidates on the technical elements was in any way justified[.]"). He contends that he should have been rated higher than Campbell on the technical criteria because of his engineering background, and that his lower ratings demonstrate that the selection process was biased. *Id.* at 15 ("There can be no dispute, for instance, that Mr. Nagi was substantially more qualified on the technical components for this position."); *id.* at 9 (contrasting Plaintiff's receipt of the lowest possible scores on areas involving technical expertise with Campbell's receipt of 4 out of 5 on the two technical elements). In addition, Plaintiff notes that he received higher technical scores in the selection process for the Supervisory General Engineer position, which was a more technically demanding job; as a result, he contends that the low scores he received for the Supervisory Program Manager job were not credible. *Id.* at 9–10.

Both of Plaintiff's arguments are unavailing. First, the evidence does not support Plaintiff's argument that his engineering experience necessarily warranted higher scores on the technical elements for the Supervisory Program Manager position. The two technical requirements were (1) "broad knowledge of the National Airspace System components and their interdependencies," and (2) "comprehensive understanding of product and service management activities involving enterprise infrastructure services, with the ability to communicate technical and programmatic information in a clear and concise manner to diverse audience." *See* Vacancy Announcement at 2. Those requirements do not appear to require an engineering background. *See* Cedro Dep. at 124:11–12 (stating that there was "very little need" for the Supervisory Program Manager to be an engineer).

17

Moreover, Plaintiff fails to muster evidence of pretext by comparing his scores on the technical elements for the Supervisory General Engineer position to those he received for the Supervisory Program Manager. While the technical elements for the two positions were similar, *compare* Vacancy Announcement at 2, *with* ECF No. 53-10 (Supervisory General Engineer Vacancy Announcement) at 1–5, Plaintiff fails to account for the substantive differences between the two jobs, which were housed in very different groups, and subject to different recruitment and hiring processes. For example, while the Supervisory General Engineer manages a team of engineers, including Plaintiff, *see* Nagi Dep. 139:12–25, the Supervisory Program Manager of Enterprise Programs manages a different team, which provides telecommunication services. *See* Def. SMF, ¶ 11; *see also* Nagi Dep. 135:20–136:9 (summarizing Plaintiff's understanding of the responsibilities of the Supervisory Program Manager for Enterprise Programs); *see also id.* at 137:6–9 ("So my understanding is . . . that the program manager position is a much higher level position than the [supervisory] general engineering position."). Thus, it is not surprising that Plaintiff, as an engineer, received higher technical scores for the Supervisory General Engineer position than he did for the Program Manager position. Moreover, it is not beyond belief that Campbell received higher scores on the technical elements for the Program Manager job based on her twelve years of experience working in the Enterprise Management Program. Thus, Plaintiff's low technical scores, in and of themselves, are not evidence of discrimination or retaliation.[7]

Plaintiff also attempts to rebut Defendant's proffered explanation with vague and speculative statements regarding the bias of Grimaldi and Cedro. *See* Pl. Opp. at 11–14.

---

[7] Plaintiff seeks to defeat summary judgment by offering conclusory assertions that a trier of fact could find him substantially better qualified for the Supervisory Program Manager position than Emily Campbell. But merely positing that a reasonable fact finder "could well determine that [he] was substantially more qualified than Emily Campbell," *see* Pl. Opp. at 15, is insufficient.

18

Plaintiff argues that Cedro is not credible because she assigned Holemans to the panel that reviewed applications for the Supervisory Engineer Position, even after Holemans had been the subject of investigations for bias. He notes that Holemans was so biased against Plaintiff in the hiring process for the Supervisory Engineering Position that her score was voided. *See id.* at 11–12. Plaintiff asserts that the process for selecting the Supervisory Program Manager was "contaminated by the bias of Ms. Holemans and the conspiracy to cover up that bias by the recruitment officials," Cedro and Grimaldi. *Id.* at 12.[8] Furthermore, Plaintiff contends that "Cedro had actual knowledge of [Plaintiff's] long complaints about the division's promotion practices," and that Cedro likely communicated that information to Grimaldi. *Id.* at 14. Plaintiff's theory that Cedro and Grimaldi colluded to prevent Plaintiff from being chosen due to discriminatory and retaliatory bias is unsupported by any evidence. The record reflects that Cedro accepted Grimaldi's initial paper review scores, and then reasonably declined to exercise her discretion to grant Plaintiff an interview when he was ranked eleventh out of 14 candidates. *See* Cedro Aff. at 4–6; Cedro Dep. at 146:12–15. Although Cedro was aware of Plaintiff's protected characteristics and activities, Grimaldi was not: There is no evidence that Cedro informed her of Plaintiff's prior protected activity or protected characteristics. Nor is there evidence that Holemans had any role in the Supervisory Program Manager selection process. Plaintiff thus fails to adduce any evidence that the proffered nondiscriminatory and nonretaliatory reasons for Plaintiff's non-selection were pretextual.[9]

---

[8] In December 2013, during the recruitment process for the Supervisory General Engineer position, Holemans returned her scores to Grimaldi. *See* Pl. Resp. SMF, ¶ 144. Grimaldi noticed some disparities in Holeman's scoring and raised her concerns to Cedro. *Id.*, ¶ 145. Cedro and Grimaldi both concluded that Holeman's scores lacked objectivity and agreed to discard the scores. *Id.*, ¶ 152. Plaintiff fails to explain how a jury could infer from this incident that Grimaldi and Cedro harbored discriminatory or retaliatory bias against him.

[9] Plaintiff argues that the process was tainted with bias by asserting that "the selecting official and the recruiting manager responsible for Mr. Nagi's facially incredible scores provided the administrative investigators with false and misleading sworn affidavits to cover their tracks." *See* Pl. Opp. at 2. Plaintiff cites no evidence and provides no context for that assertion. Plaintiff also seeks to attack Cedro's credibility by noting that she swore that

This Court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motives." *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (quoting *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996)); *see also Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (stating that a court may not act as a "super-personnel department that reexamines an entity's business decisions" (citation omitted)). Because Plaintiff fails to offer any evidence that Defendant's legitimate, nondiscriminatory and nonretaliatory reasons for his non-selection were a pretext for discrimination, there is no genuine issue of material fact to be determined at trial. Defendant is therefore entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. A separate Order will issue this day.

                                                                                       _____
                                                                                       FLORENCE Y. PAN
                                                                                       United States District Judge

Date:   July 22, 2022

---

no post-ranking assessment was made, and that the "top six" scorers were granted interviews; Plaintiff claims this averment is "utterly false." *See* Pl. Opp. at 11. Cedro did acknowledge that she made a mistake in her affidavit when she stated that only the top six candidates rated by Grimaldi were interviewed, as two other candidates who were not considered by Grimaldi also were interviewed. *See* Cedro Dep. at 49:15–50:4; 131:21–132:2; 143:15–144:19. That minor error does not demonstrate pretext or bias on Cedro's part, and lacks materiality where Plaintiff was ranked eleventh in Grimaldi's review.